UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
KWAME OWUSU,

              Plaintiff,
                      :  **REPORT & RECOMMENDATION**

      -against-
                      : 05 Civ. 06981 (DAB)(MHD)

HSBC BANK USA, NATIONAL
    ASSOCIATION,              :

           Defendant.   :
-----------------------------------x

TO THE HONORABLE DEBORAH A. BATTS, U.S.D.J.:

    Plaintiff Kwame Owusu commenced this action as a pro se
plaintiff against defendant HSBC Bank USA, National Association
("HSBC"). Owusu alleges violations by the defendant of the Consumer
Credit Protection Act ("CCPA"), 15 U.S.C. § 1601, et seq.,
including violations of CCPA Title I, the Truth in Lending Act, 15
U.S.C. § 1601, et seq., as amended by the Fair Credit Billing Act
("FCBA"), 15 U.S.C. § 1666; CCPA Title VI, the Fair Credit
Reporting Act ("FCRA"), 15 U.S.C. § 1681, et seq.; and CCPA Title
VIII, the Federal Debt Collections Practices Act ("FDCPA"), 15
U.S.C. § 1692, et seq. Plaintiff also claims that defendant
improperly managed his credit card and checking accounts in
violation of state and federal laws.

    Defendant has moved for summary judgment, and plaintiff, in
his opposition to defendant's motion, requests that discovery be

reopened. For the reasons that follow, we recommend that defendant's motion be granted.

BACKGROUND

I.   The Evidentiary Record

Plaintiff maintained a checking account and a secured credit card account with HSBC (Decl. Of Michael T. Ryan, executed on Feb. 28, 2008 ("Ryan Decl."), at ¶¶ 4-6),[1] and provided security for the credit card in the form of a $500 deposit in an HSBC savings account. (Id. at ¶ 9). The credit card also provided plaintiff overdraft protection for his checking account -- the bank charged the credit-card account with the value of any overdraft less than the credit available, allowing plaintiff to avoid fees charged by the bank for insufficient funds. (Id. at ¶¶ 7-8). Plaintiff's employer, the New York State Insurance Department ("NYSID"),

---

[1] In 1993 plaintiff opened a checking account with Marine Midland Bank, which was subsequently acquired by HSBC. (Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Opp'n") ¶ 3; Def.'s Mem. of Law at 1). It is unclear when plaintiff opened the secured credit card account with HSBC -- plaintiff states that he opened the account in September 1999 (Opp'n ¶ 4), but the date on the copy of the application provided by defendant is obscured and neither party provided statements from the account before December 2000. (See Ryan Decl. Exs. C, G). While plaintiff asserts that the date that the account was opened must be established (Opp'n ¶ 3), his allegations relate to events that occurred after December 2000, and therefore the lack of clarity surrounding the date that the account was opened is not relevant to our analysis.

2

directly deposited plaintiff's paychecks into his checking account. (Fourth Am. Compl. ("Compl.") ¶ 3).

Between December 2000 and April 2005 plaintiff overdrew his checking account on several occasions. Plaintiff had sufficient credit available to cover many of these overdrafts.[2] On other occasions, however, plaintiff did not have sufficient credit available and in these instances HSBC charged his checking account fees for insufficient funds.[3] Plaintiff also regularly carried a balance on his credit card, and between November 2001 and November 2004 he frequently ended the monthly billing cycle with a balance greater than his credit limit of five hundred dollars. (See Ryan Decl. Ex. G at 12, 14, 15, 16, 24, 26, 35, 38, 40, 41, 49, 51).

---

[2] For instance, on August 10, 2001 plaintiff overdrew his account by $44.89 and on August 13, 2001 $45.00 was transferred from his line of credit, with no fees being charged. (See Ryan Decl. Ex. F at 33). Plaintiff's overdrafts were similarly covered by available credit on February 8, 2001; February 12, 2002; August 12, 2002; February 10, 2003; September 23, 2003; December 2, 2003; May 12, 2004; July 12, 2004; July 21, 2004; and September 8, 2004. (See Ryan Decl. Ex. F at 8, 56, 76, 93, 118, 126, 148, 154, 157).

[3] On February 21, 2001 plaintiff overdrew his account by $346.91, but had only $310.52 in available credit. (See Ryan Decl. Exs. F at 11; G at 4). On August 8, 2001 plaintiff overdrew his account by $208.39 but had only $7.05 in available credit. (See Ryan Decl. Exs. F at 30, 33; G at 10). Plaintiff overdrew his account by an amount greater than his available credit on November 5, 2001; November 16, 2001; January 29, 2002; February 8, 2002; December 11, 2002; June 10, 2003; January 23, 2004; September 21, 2004; and November 5, 2004. (See Ryan Decl. Ex. F at 41, 45, 52, 53, 89, 108, 134, 160, 162).

3

Until late 2004, plaintiff frequently overdrew his checking account and carried a balance on his credit-card account, but he regularly deposited money into his checking account and made payments on his credit card. On November 29, 2004, however, plaintiff's employer notified him that it was suspending his direct deposit privileges as a result of alleged falsification of time and attendance records. (See Compl. Ex. 1; Decl. of Davin Z. Goldsztajn, executed Feb. 29, 2008 ("Goldsztajn Decl."), Ex. B at 28).

In December 2004, NYSID suspended plaintiff without pay as the result of a timecard and attendance dispute. (See Goldsztajn Decl. Ex. B at 24).[4] NYSID deposited his last paycheck into his checking account on November 17, 2004. Thereafter, although neither plaintiff nor any other party made any deposits into the account, he continued to issue checks drawn on the account, and on November 22, 2004 the account was again overdrawn. (See Ryan Decl. Ex. F at 164-73).

Aside from separate monthly statements for this checking account and the credit-card account, which notified plaintiff of the balance owed to both accounts, HSBC sent plaintiff a letter on

---

[4] Plaintiff then entered arbitration over this dispute, which lasted until December 2006, at which point his employment was terminated. (See Goldsztajn Decl. Ex. B at 24).

4

December 14, 2004 notifying him that his checking account was overdrawn by $127.04 and providing him with contact information for an HSBC employee who would discuss his outstanding balances with him. (Compl Ex. D2-SM).[5] Plaintiff responded by letter on January 20, 2005, stating that HSBC had not notified him of "any understanding reached between HSBC and the state of New York to formally cancel the governing contractual agreement ... [or] when and why the state unilaterally breached such contractual agreement...." (Id.). Plaintiff then demanded that HSBC "explain how and why this account has become overdrawn ... and why a secured overdraft protection credit ... could not be effected...." (Id.).

When plaintiff failed to pay the balance due on the checking account, HSBC closed the account on March 10, 2005 without responding to plaintiff's January 20, 2005 letter, and reported his "account abuse" to ChexSystems, a "third-party service [that] provides access to a deposit account computer database to member financial institutions seeking to determine whether to open deposit accounts for new customers." (Ryan Decl. ¶¶ 25-28).

As for plaintiff's credit-card account, he had a debit balance

---

[5] Plaintiff alleges that HSBC inconsistently sent him statements after September 11, 2001. (Opp'n ¶ 9). However, we may assume that he received the December 14, 2004 letter, as it was attached as an exhibit to the Fourth Amended Complaint.

5

remaining outstanding balance of $221.08.[7] (Compl. Ex. D2-SM).

## II.  The Present Proceedings

Owusu initially filed a complaint in August 2005 against his former employer, NYSID, his former employer's agents, and HSBC, alleging that his employer had illegally discriminated against him by suspending him without pay and that HSBC had acted improperly while managing Owusu's checking, credit-card, and savings accounts. This court dismissed all claims against Owusu's former employer and its agents, but because Owusu's claims against defendant HSBC did "not clearly make out any cognizable claim," the court allowed Owusu the opportunity to amend his complaint with regard to claims brought against HSBC. See Owusu v. New York State Insurance, No. 05 Civ. 6981, Order at 10, 13 (S.D.N.Y. Aug. 8, 2006).

On November 15, 2006 Owusu, a citizen of New Jersey, filed his Fourth Amended Complaint against HSBC, which has been an FDIC insured national bank[8] and a citizen of New York[9] since July 1,

---

[7] HSBC did not hold plaintiff accountable for a finance charge of $4.71. (Ryan Decl. Ex G at 59).

[8] See Key Demographic Information as of March 26, 2009 for HSBC Bank USA, National Ass'n (FDIC Certificate # 57890), available at http://www2.fdic.gov/idasp/main.asp (designating HSBC Bank USA to be a National Bank regulated by the Office of the Comptroller of the Currency); see also Press Release, HSBC USA, HSBC USA Received Approval For National Charter (June 24,

2004. Prior to that date, defendant was a New York State chartered bank that was a member of, and supervised by, the Federal Reserve.[10]

Plaintiff alleges that HSBC (1) improperly determined that certain checks he had issued had overdrawn his checking account, (2) took improper actions when closing his account and reporting him to ChexSystems and a "bounty hunter," and (3) was involved in a conspiracy with his former employer, NYSID, to discredit him. According to Owusu, these actions constituted breaches of contract and fiduciary duty, unfair debt collection practices, and lack of due diligence. He contends that they violated state and federal banking and consumer protection laws, including the FCBA, the FDCPA, and the FCRA. He further alleges that as a result of HSBC's communication of personal information to third parties, its alleged conspiracy with his former employer, and its purported sale of his debt to a debt collection firm, he has been injured in a number of ways, including damage to his reputation, inability to establish a

---

2004) available at http://www.hsbcusa.com/ourcompany/bankarchives /bk2004/news_hbarch062404.html (announcing OCC's approval to form HSBC USA, N.A.).

[9] A national bank is a citizen of the state where it maintains its main office as set forth in the bank's articles of association, which in this case is New York. Wachovia Bank, Nat. Ass'n v. Schmidt, 546 U.S. 303, 313-18 (2006).

[10] See Key Demographic Information as of April 20, 2009 for HSBC Bank USA (FDIC Certificate # 589), available at http://www2. fdic.gov/ISASP/mail.asp (documenting that the state chartered institution became inactive as of July 1, 2004).

of $546.06 for the billing cycle that ended September 22, 2004 --
$46.06 over his credit limit. (Ryan Decl. Ex. G at 49). Plaintiff
made his last payment, of fifty dollars, to his credit-card account
on September 28, 2004, bringing his balance owed to $496.06. (See
Ryan Decl. Ex. G at 49). His balance again exceeded his credit
limit, due to an over-limit fee incurred on October 21, 2004,
presumably charged for exceeding his credit limit during the
previous billing cycle. (Id. at 49-60). Plaintiff made no further
payments on his credit-card account, and by January 1, 2005 the
amount owed ballooned to $774.33 as a result of accumulating fees
for late payment, over-limit charges, finance charges, and an
annual fee. (Id.).


On January 26, 2005 HSBC closed plaintiff's savings account,
which held his credit card security deposit, and applied the
$553.25 in that account to the outstanding balance of his credit
card, reducing his debt from $774.33 to $225.79. (Ryan Decl. ¶ 22,
Exs. G at 59, H at 53).[6] Shortly thereafter, HSBC notified
plaintiff by letter dated January 28, 2005 that he still owed a

_____

[6] Plaintiff alleges that defendant applied the money in his
security deposit account to his credit card debt without
crediting him for the interest accrued by that account. (Compl. ¶
6). The statements provided by defendant show that it did indeed
apply the $53.25 earned in interest on the $500 deposit to the
credit card balance. (Ryan Decl. Ex. G at 59).

6

bank account at any other institution, and loss of business opportunities that he expected to generate \$200,000.00 in profits. (Compl. ¶¶ 10, 12-13).

Following the completion of discovery, defendant moved for summary judgment. In substance it argues: (1) that it had no duty to notify plaintiff when his employer terminated the direct deposit of his paychecks, (2) that plaintiff indeed overdrew on his checking account and carried a balance on his credit card in an amount greater than the savings account that secured the credit card, (3) that it was within HSBC's rights to return the bounced checks and ultimately close plaintiff's accounts, (4) that plaintiff shows no causal connection between the bank's actions and any lost business opportunity, and (5) that it is not a proper defendant under the FDCPA or the FCRA.

Plaintiff opposes defendant's motion. First, he claims that HSBC had falsified documents by forging his signature on his checking account application and tampering with the credit-card application submitted with the summary judgment motion. (Opp'n ¶ 4, 7-8). Second, he alleges that HSBC failed to send him many account statements during the period he maintained accounts with the bank, and never provided him with a copy of its Rules for Deposit Accounts, which governed the checking account. (Opp'n ¶ 5, 9-10).

9

Third, he asserts that HSBC officials manipulated the timing of his deposits to ensure that checks deposited by him cleared only after he had withdrawn sufficient funds to overdraw on his account, in order to generate fees for the bank. (Opp'n ¶ 6). Fourth, he claims that HSBC improperly sold his debt to Laridian Consulting, Inc. ("Laridian"), and then still sought to collect that debt in early 2005. Plaintiff also objects to HSBC's description of the circumstances surrounding his suspension, and eventual termination, by NYSID, noting that he filed a complaint against several supervisors and union officials with the Equal Employment Opportunity Commission and with a New York State entity, and commenced litigation in both state and federal court. Plaintiff asserts that his suspension was retaliatory, and violated union contract rules. (Id. at ¶ 11). Apart from opposing summary judgment, plaintiff requests further discovery.[11]

HSBC argues in reply principally that Owusu's speculative assertions that his account had been tampered with and that the signature on his checking and credit-card applications had been

---

[11] Plaintiff on several occasions requested further discovery after the period for discovery had closed. (See letters from Kwame Owusu to the Court dated Jan. 23, 2008; Feb. 14, 2008; Feb. 26, 2008; Feb. 29, 2008; and Mar. 5, 2008). When appropriate, the Court ordered defendant to produce the requested documents to plaintiff (see Order dated Feb. 14, 2008), but otherwise determined that defendant had fulfilled its discovery obligations.

forged do not suffice to defeat a motion for summary judgment because he provides no evidence of the alleged tampering. (Reply 2-3). It also notes that plaintiff, who now disputes the nature of the credit-card account, never objected before, and instead made extensive use of it. (Id. at 3). Finally, the bank offers further documentation of the fact that it declined to pay on a check issued by plaintiff because his account had insufficient funds at the time to cover it. (Id. at 4-5; Decl. of Michael T. Ryan, executed Apr. 10, 2008 ("Ryan Reply Decl.") ¶¶ 3-10 & Ex. A).

## ANALYSIS

### I. Summary Judgment Standard

We may enter summary judgment for HSBC only if, after considering the pleadings and the supporting affidavits provided by parties, we find that, based on the undisputed facts, "no genuine issues as to any material fact and [that HSBC] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir. 2003). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable

11

jury could return a verdict for the nonmoving party.'" Shade v. Hous. Auth. of the City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)); see also Williams v. Utica College of Syracuse Univ., 453 F.3d 112, 116 (2d Cir. 2006). It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986); see, e.g., Anderson, 477 U.S. at 255; Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the "pleadings, the discovery and disclosure materials on file, and any affidavits" that demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); see, e.g., Celotex, 477 U.S. at 322; Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir. 2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy its initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. See, e.g., Celotex, 477 U.S. at 322-23, 325; PepsiCo, Inc. v. Coca-Cola Co.,

12

315 F.3d 101, 105 (2d Cir. 2002); Goenaga v. March of Dimes Birth
Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). If the movant fails
to meet its initial burden, the motion will fail even if the
opponent does not submit any evidentiary materials to establish a
genuine factual issue for trial. See, e.g., Adickes v. S.H. Kress
& Co., 398 U.S. 144, 161 (1970); Giannullo v. City of New York, 322
F.3d 139, 140-41 (2d Cir. 2003).

Once the moving party meets the burden of showing that summary
judgment is warranted, the opposing party "'must do more than
simply show that there is some metaphysical doubt as to the
material facts.... [T]he nonmoving party must come forward with
specific facts showing that there is a genuine issue for trial.'"
Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
586-87 (1986) (emphasis in original). When evaluating whether a
genuine dispute of material fact exists, we are bound to view the
evidence submitted by parties in the light most favorable to
plaintiff, as the party opposing the summary judgment motion. Id.
However, plaintiff "may not rest upon mere conclusory allegations
or denials, but must bring forward some affirmative indication that
his version of relevant events is not fanciful." Podell v. Citicorp
Diners Club, Inc., 112 F.3d 98, 110 (2d Cir. 1997) (internal
quotations omitted). Plaintiffs must proffer competent evidence

13

that is "significantly probative" to defeat summary judgment. See Anderson, 477 U.S. at 249-50; Olaiya v. Dep't of Juvenile Justice, 210 F.3d 355, 355 (2d Cir. 2000) (finding that a pro se plaintiff failed to proffer evidence to support his employment discrimination claim); Lewis v. N. Gen. Hosp., 502 F. Supp.2d 390, 406 (S.D.N.Y. 2007) (citing Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 204 (2d Cir. 1995)). Merely alleging a factual dispute cannot suffice.

We are also required to construe the pleadings of a pro se plaintiff broadly, and interpret them "to raise the strongest arguments that they suggest." Pabon v. Wright, 495 F.3d 241, 248 (2d Cir. 2006) (internal quotations omitted). However, bald assertions made by a pro se litigant that are unsupported by evidence are insufficient to defeat a motion for summary judgment. See, e.g., United States v. Acomb, 216 F.3d 1073, 1073 (2d Cir. 2000) (quoting Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991)).

## II. Assessment of Plaintiff's Claims

We will first address Owusu's claims and assertions that relate to his account applications. Second, we will consider his complaints about HSBC's administration of his accounts from 1999 to 2004. Third, we will assess plaintiff's allegations regarding the

14

events occurring in late 2004 and early 2005, starting with his claims that HSBC conspired with NYSID and neglected its duty to notify him that NYSID had terminated his direct deposit privileges and then moving on to his claims that HSBC improperly closed his accounts, sold his debt to a bounty hunter, and reported him to ChexSystems. Finally, we will consider plaintiff's alleged damages.

## A.    Claims Relating to Plaintiff's Account Applications

### 1.    Plaintiff's Checking Account

Plaintiff alleges that HSBC forged his signature on an application for a checking account, and notes that the application is not itself dated. (Opp'n ¶ 4; Ryan Decl. Ex. A). He claims that HSBC's forgery of the account application makes it difficult to establish the date when the account was created. (Opp'n ¶ 4). We infer from plaintiff's response to defendant's motion for summary judgment that he alleges that HSBC committed a fraudulent act.

Under New York state law, the elements of common-law fraud are (1) representation of a material fact, (2) falsity, (3) scienter, (4) reliance, and (5) injury. See Vermeer Owners, Inc. v. Guterman, 78 N.Y.2d 1114, 1116, 578 N.Y.S.2d 128, 129 (1991); Kline v. Taukpoint Realty Corp., 302 A.D.2d 433, 433, 754 N.Y.S.2d 899 (2d

Dep't 2003). While plaintiff has arguably alleged facts in support of the first three elements, he at no point argues that any party relied upon the allegedly fraudulent application, and he does not assert that he was injured by the allegedly fraudulent act or suffered any damages as a result of the terms of the application.

Wholly apart from plaintiff's failure to articulate a viable legal claim based on his assertion of forgery, he offers no competent evidence that his signature was forged. See, e.g., Odom v. Bellevue Hosp. Center, 1994 WL 323666, at *4 (S.D.N.Y. July 4, 1994) (holding that a plaintiff's allegation of forgery could not survive summary judgment when he proffered no evidence in support of his allegation, and failed to argue any harm was caused by the alleged forgery). Apart from this omission, he fails to proffer evidence of any injury from the purported forgery. Although he states that he is unable to identify when the account was opened, there is no dispute that he had this checking account, as reflected in account statements proffered by plaintiff himself, and since the only allegations of impropriety by HSBC postdate the earliest of these statements, any ambiguity about when the account was opened is immaterial.

16

## 2. Plaintiff's Secured Credit-Card Account and Savings Account

Plaintiff makes several allegations of bank misconduct in connection with his applications for a credit-card account and for a savings account. First, he asserts that HSBC fraudulently tampered with his application for an unsecured credit card, copying his signature onto an application for a secured credit card. (Opp'n ¶¶ 7-8, 13; letter to the Court from Kwame Owusu dated Feb. 26, 2008). Second, plaintiff insists that HSBC similarly tampered with an application by him for a savings account that he had opened with the intention of providing overdraft protection to his checking account. According to plaintiff, as a result the savings account opened for him by the bank provided security for his credit-card account and not for his checking account. (Id.) The implication of the changes that plaintiff alleges HSBC made is that he was misled into believing that he could overdraw his checking account by up to $500.00 without being charged or penalized. In fact, however, his overdraft protection was limited to the amount of the credit available on his credit-card account, which at times was none at all, as he frequently exceeded his $500.00 limit on the card. (See Ryan Decl. Ex. G at 12, 14, 15, 16, 24, 26, 35, 38, 40, 41, 49, 51).

Putting to one side the legal significance of plaintiff's

17

allegations if they were credited, there is no factual basis for them on the current record. HSBC proffers as evidence a copy of plaintiff's credit-card application, which, though admittedly difficult to read,[12] makes clear that it is for a secured credit card. (Ryan Decl. Ex. C). Plaintiff provides absolutely no competent evidence for his allegations that he applied for an unsecured card and that the bank then "lifted" his signature and copied it onto an application that he did not fill out. His assertion to this effect is purely conclusory and speculative, and as such carries no weight on a summary-judgment motion. Moreover, apart for the documentation proffered by HSBC, plaintiff himself supplies evidence demonstrating that he was on notice of the nature of the credit-card account. Thus plaintiff attaches as an exhibit to his opposition papers a statement for his checking account dated January 10, 2001 and a statement for his credit-card account for the billing cycle dated June 21, 2004. (Opp'n at ¶ 10 & Exs. C1-SM, C2-SM).[13] The checking-account statement identifies plaintiff's

_____

[12] Although the date of the application appears illegible, plaintiff makes no allegations that require determining the exact date on which he applied for the credit-card account, as all relevant events happened after 2001, when the account was clearly in use.

[13] Plaintiff only says that he received statements for the various accounts intermittently (see Compl. ¶ 5; Opp'n ¶ 9), implying that, over the course of several years, he received more than the two statements provided as exhibits. Receipt of these statements, whether or not intermittently, only reinforces the undisputed fact that he had notice of the nature of each of the accounts.

18

credit-card account number as the account providing overdraft protection. (Id.). Therefore, plaintiff had notice at least as of January 2001 that his credit card, and not the savings account, was providing overdraft protection for his checking account. (Opp'n Ex. C1-SM). Plaintiff makes no claim that he approached HSBC at the time of receipt of this statement, or at any time before initiating this lawsuit, to clarify his purported misunderstanding.

In sum, there is no triable dispute as to the nature of the credit-card account.

### B. Complaints Related to HSBC's Administration of Plaintiff's Account

#### 1. Plaintiff's Allegations that HSBC Failed to Send Regular Statements

Plaintiff asserts that HSBC only intermittently mailed to him account statements for his checking, credit-card, and savings accounts. (See Compl. ¶ 5; Opp'n ¶ 9). Plaintiff alleges, without advancing a cognizable legal theory, that HSBC's alleged failure to send him statements resulted in frustration, as he had to "request periodic computer extractions of his monthly statements from a branch office" (Opp'n ¶ 9), and caused him to be unaware that a check had been returned unpaid due to an overdraft, which in turn resulted in the filing of criminal charges against him by a third

19

party to whom the check had been issued. (Compl. ¶ 5). Plaintiff's complaint might also be read to allege that his non-receipt of his credit card statements was a violation of the FCBA, 15 U.S.C. § 1666.

"Proof that an item was properly mailed gives rise to a rebuttable presumption that the item was received by the addressee." New York and Presbyterian Hosp. v. Allstate Ins. Co., 29 A.D.3d 547, 547, 814 N.Y.S.2d 687, 687 (2d Dep't 2006) (holding that because there was no proffer that a bill was actually mailed nor a description by affidavit of the office mailing practice, no presumption was created); see also Meckel v. Cont'l Res. Co., 758 F.2d 811, 817 (2d Cir. 1985) (citing New York State law). See, e.g., D.M. Rothman & Co., Inc. v. Korea Commercial Bank of New York, 411 F.3d 90, 98 (2d Cir. 2005). This presumption may be created by either "proof of actual mailing" or "proof of a standard office practice or procedure designed to insure that items are properly addressed and mailed." Id. (internal quotations omitted). If a party seeks to prove that a mailing took place by offering evidence that the standard office practice is trustworthy, that "'office practice must be geared so as to insure the likelihood that a [letter] is always properly addressed and mailed.'" Badio v. Liberty Mut. Fire Ins. Co., 12 A.D.3d 229, 229, 785 N.Y.S.2d 52, 52 (1st Dep't 2004) (quoting Nassau Ins. Co. v. Murray, 46 N.Y.2d 828,

829, 414 N.Y.S.2d 117, 117 (1978)).

With regard to office procedures, defendant asserts that "it is HSBC's general business practice to automatically generate account statements on a monthly basis and forward those statements to its account holders. This is not a manual process." (Ryan Decl. ¶ 16). Without any specificity, this assertion may be insufficient to show that HSBC's practice would make delivery likely, but the record offers further support for HSBC's contention. Plaintiff admits having received bank statements, and those statements proffered by plaintiff (Opp'n Ex. C1-SM) were labeled with the same address as those provided by defendant as evidence. (Ryan Decl. Exs. F, G, H). Hence, on the current record there is a presumption that HSBC did in fact send statements monthly. (Compl. ¶ 9; Opp'n ¶ 9, Exs. B2-SM & C2-SM). Moreover, this inference is further strengthened because plaintiff presents no evidence that he ever notified HSBC that he was not receiving statements.

Finally, plaintiff fails to link this alleged omission to a cognizable legal theory, much less to offer evidence that he was injured by virtue of the alleged non-receipt of some of the account statements. With regard to the FCBA, plaintiff does not state a claim. The FCBA requires that an obligor notify a creditor of a billing error in writing within 60 days of receipt of a statement.

21

15 U.S.C. § 1666(a); Kurz v. Chase Manhattan Bank, 273 F. Supp.2d 474, 478-79 (S.D.N.Y. 2003). Because plaintiff concedes that he did receive a certain number of his credit-card statements, including one for the billing period beginning June 16, 2004 (Compl. Ex. C1-SM), and presents no evidence that he ever notified HSBC that he was not receiving statements, HSBC is not liable for statutory damages under the FCBA. 15 U.S.C. § 1666(a); see, e.g., Langenfeld v. Chase Bank USA, NA, 537 F. Supp.2d 1181, 1193 (N.D. Okla. 2008); Turk v. Chase Manhattan Bank USA, NA, 2001 WL 736814, at *3 (June 11, 2001). Plaintiff also alleges no specific mistakes in the accounting or billing of his credit card during the duration that the account was active that would create further liability under the 15 U.S.C. § 1666(e).

With regard to plaintiff's allegations that his non-receipt of statements resulted in frustration and the filing of criminal charges against him, plaintiff cannot recover against HSBC for mere frustration or annoyance, see e.g., Hirchfeld v. Spanakos, 909 F. Supp. 180, 184 (S.D.N.Y. 1995), rev'd on other grounds 104 F.3d 16 (2d Cir. 1997), and he certainly cannot recover for harms supposedly caused by the filing of criminal charges by an unidentified third party, much less prevail without the proffer of any evidence to support this claim, including identification of the third party or the check issued to that party, or any other

22

circumstances regarding the events to which he conclusorily alludes. See Tevdorachvili v. Chase Manhattan Bank, 103 F. Supp.2d 632, 641 (E.D.N.Y. 2000); Spang Indus., Inc. v. Aetna Casualty and Surety Co., 512 F.2d 365, 368 (2d Cir. 1975). Finally, because plaintiff clearly demonstrated that he knew how to acquire the information from the branch bank on those occasions when he did not receive a monthly statement (Compl. ¶ 9; Opp'n ¶ 9, Exs. B2-SM & C2-SM), he cannot show he was harmed by any HSBC failure to mail his statements to him.

### 2. Manipulation of Dates of Deposits

Plaintiff claims that "HSBC manipulated the dates for clearing [his] check payments in such a way that although the dates in question coincided with those scheduled for his salary deposits to the account, HSBC still found grounds to return [his] checks unpaid" and charge him a fee for overdrawing on his account, and in the process ignored the overdraft protection. (Compl. ¶ 7). Plaintiff cannot sustain this claim.

The National Bank Act ("NBA") authorizes national banks to receive deposits and charge fees for deposit-related services. 12 U.S.C. § 24. However, this federal grant of authority is not sufficiently comprehensive to constitute a legislative scheme that

23

displaces state law. 7A M. J. Divine, et al., <u>Michie on Banks and Banking</u> Ch. 15 § 178 at 391-92 (1999 Replacement Vol.). Therefore, the Uniform Commercial Code ("UCC"), codified in New York as N.Y. U.C.C. Law § 4-101 <u>et seq.</u>,[14] governs, for both state-chartered banks and national banks, the collection of funds from other banks and the payment of funds to other banks that results when checks are issued by a payor and deposited by a payee into a deposit account.[15] Accordingly, the UCC governs plaintiff's claims relating to his checking account.

---

[14] The UCC states that "[t]he liability of a bank for action or non-action with respect to any item handled by it for purposes of presentment, payment, or collection is governed by the law of the place where the bank [or the branch office] is located." N.Y. U.C.C. Law § 4-102. Plaintiff opened his accounts in New York State, and therefore New York State law governs HSBC's management of his checking account. (<u>See</u> <u>also</u> Ryan Decl. Ex. B ("Rules for Deposit Accounts") at OWUSU0101 (plaintiff's account was governed by New York State law and regulations and the Federal Reserve Bank rules)).

[15] National banks are governed by the NBA, 12 U.S.C. § 21 <u>et seq.</u> and regulations promulgated by the Office of the Comptroller of the Currency ("OCC"). In certain areas of operation, however, state law governs national banks. <u>See</u>, <u>e.g.</u>, <u>Frost Nat'l Bank v. Midwest Autohaus, Inc.</u>, 241 F.3d 862, 872-73 (7th Cir. 2001) (holding that compliance with OCC regulations was not itself sufficient to constitute adherence to the UCC requirement that a bank exercise good faith and ordinary care). Nonetheless, a federal law or regulation preempts any state law with which it conflicts. <u>See</u>, <u>e.g.</u>, <u>Murphy v. Nat'l City Bank</u>, 560 F.3d 530, 532-33 (6th Cir. 2009); <u>First Nat'l Bank of Chicago v. Standard Bank & Trust</u>, 172 F.3d 472, 475 (7th Cir. 1999); <u>Washington Petroleum and Supply Co. v. Girard Bank</u>, 629 F. Supp. 1224, 1229-30 (M.D. Pa. 1983) (explaining that an OCC regulation extends a deadline set by the UCC).

The UCC allows contractual agreements between parties to define the terms that govern deposit accounts:

The effect of the provisions of [N.Y. U.C.C. Law Art. 4] may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care[,] ... but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable.

N.Y. U.C.C. Law § 4-103(1). It is permissible for parties to modify the requirements of the UCC to conform them to the realities of commercial usage, David Graubart, Inc. v. Bank Leumi Trust Co., 48 N.Y.2d 554, 560, 423 N.Y.S.2d 899 (1979), and if a depositor assents to rules dictating when funds deposited in the form of checks must become available, and if there is no reason to question the validity of the agreement or the reasonableness of the rules, the depositor cannot challenge those time restrictions. Rapp v. Dime Sav. Bank of New York, 48 N.Y.2d 658, 659, 421 N.Y.S.2d 347 (1979).

The checking account application that Owusu signed stated that HSBC was to "handle [the] account according to the 'Rules for Deposit Accounts' and the 'Terms and Charges Disclosure'", and that "the 'Rules' and 'Terms and Charges Disclosure' are a binding contract between" Owusu and HSBC, which meant that the provisions of the "Rules for Deposit Accounts" ("Rules") governed Owusu's

25

checking account. (Ryan Decl. Ex. A).[16]

The Rules governing plaintiff's checking account state that it is HSBC's policy "to make funds from ... deposits quickly available ... according to a schedule which is based on where the check is drawn, where the deposit is made, and the type of account." (Ryan Decl. Ex. B at OWUSU0090). The Rules further state that funds from electronic direct deposits will be "available on the day the Bank receives final credit for the deposit." (Id.). Funds from the U.S. Treasury and from checks drawn from HSBC Bank USA accounts become available on the business day following the deposit. (Id.). Finally checks drawn on New York and New Jersey state banks are available on the second business day after deposit and checks drawn on out-of-state banks within the territory of the United States are available on the third business day after deposit. (Id. Ex. B at

_____

[16] Plaintiff says that he did not receive a copy of the Rules when he opened his account with HSBC. (Opp'n ¶ 5). Under New York State law, documents extrinsic to a contract are incorporated as terms of the contract when they are specifically referenced in the contract. PaineWebber, Inc. v. Bybyk, 81 F.3d 1193, 1201 (2d Cir. 1996) (quoting Chiacchia v. Nat'l Westminster Bank USA, 124 A.D.2d 626, 628, 507 N.Y.S.2d 888, 889-90 (2d Dep't 1986)). If the extrinsic document can be identified "beyond all reasonable doubt" by the description in the contract, then it may be inferred that parties have knowledge of the document and assent to its terms, regardless of whether they are given a copy. Id.; see, e.g., Sea Trade Co. Ltd. v. FleetBoston Financial Corp. 2007 WL 1288592, at *4 (S.D.N.Y. May 1, 2008). Moreover, the application states that the signor "acknowledge[s] receiving copies of [the Rules]." (Ryan Decl. Ex. A). Because Owusu signed the account application that explicitly referred to the Rules, he was bound to the terms of the Rules.

26

OWUSU0093).[17] These time-frames for making funds available from deposited checks are similar to those set forth in the UCC.[18]

Although plaintiff asserts that HSBC occasionally failed to credit incoming funds -- including direct deposits from his employer -- on a timely basis, thereby causing some of his own checks to be dishonored, he offers no evidence for this assertion. To demonstrate that the funds from deposited checks were required to be available earlier than when the bank credited them to plaintiff's account, he would have to offer evidence of the date the check was deposited and the bank from which the funds were to be drawn. Plaintiff provides no such evidence, not even a calendar from his former employer identifying the dates on which the direct deposit of his paycheck was to occur. Therefore, his allegations

---

[17] HSBC specifies that any deposit must be made before 2 p.m. to be considered as having been received on that day. Any deposit received after 2 p.m is to be treated as having been received at the opening of the next business day. (Ryan Decl. Ex. B at OWUSU0090). This rule is consistent with the U.C.C. N.Y. U.C.C. Law § 4-107.

[18] The UCC requires that when a bank receives a check depositing funds from an account at another bank, subject to the bank's right to apply deposits to obligations outstanding, the bank must forward the check to the payor bank on the next business day or in two business days if the check was deposited after 2 p.m., N.Y. U.C.C. Law § 4-202(1), and the payor bank must present payment for the check the day after receipt. N.Y. U.C.C. Law § 4-301(a) cmt. 1. The collecting bank must make the funds available to the depositor the day after the collecting bank receives settlement from the payor bank. N.Y. U.C.C. Law § 4-213(5).

27

that HSBC manipulated the dates that deposited checks cleared in order to charge him overdraft fees cannot be pursued.

Owusu also alleges that HSBC tampered with the deposit date of check #1595, which he issued on February 15, 2003. Again, however, plaintiff provides insufficient evidence to create a triable dispute as to defendant's alleged wrongdoing.

The check, for $1,700.00 made out to Aggie Owusu, was presented by her to HSBC on February 18, 2003, and reversed the next day, which was indicated on the statement as "REVERSAL-CHECK DRAWN ON UNCOLLECTED FUNDS."[19] (Opp'n ¶ 6 & Ex. B2-SM; Ryan Decl. Ex. F at 95). The statements provided by both HSBC and plaintiff for the period indicate that on February 14, 2004 a check for $3,470.00 was deposited into plaintiff's account. Plaintiff claims that this deposit was an electronic transfer of his tax refund from the IRS (Opp'n ¶ 6), in which case the governing rules required that the bank credit the funds on the day when it received full

---

[19] When a check was reversed because plaintiff's account had insufficient funds to cover it, as opposed to situations where he had made a deposit prior to the issuance of the check that, once collected, would cover the check, the statement labeled the check as "REVERSAL-CHECK THAT CAUSED OVERDRAFT," and in these situations HSBC charged plaintiff a service charge for insufficient funds. (See, e.g., Ryan Decl. Ex. F at 11).

28

credit for the deposit.[20]

Plaintiff introduces no evidence, however, to support his contention that the deposit was an electronic transfer from the IRS. Indeed, on one occasion when the IRS did electronically transfer Owusu's tax refund into his account, the statement described the deposit as a "DEPOSIT FROM US TREASURY 220-TAX REFUND," whereas the February 14 deposit is only described as "DEPOSIT" on the statement. (Ryan Decl. Ex F at 63, 95).

In contrast, defendant demonstrates without meaningful contradiction that the deposit of $3,470.00 was through an out-of-state cashier's check, not the electronic deposit of plaintiff's tax refund. (Ryan Reply Decl. ¶ 4-5 & Ex. A; Reply at 4).[21] Because

_____

[20] The pertinent statement lists the check as received on February 14, 2007. (Id.). Hence, if it had been credited that day, there would have been sufficient funds in the account to cover check # 1595.

[21] The representation on an account statement showing a balance in the depositor's favor "is sufficient evidence ... of the bank's indebtedness to him." Michie Ch. 9 § 308 at 423. However, for an individual to rely on such a statement as evidence that there are sufficient funds in an account to cover a check, the individual must request and receive the statement before the check is written. Id. Because plaintiff states that he received the electronic printout of the statement that he presents as evidence a few days after check #1595 was returned, and that printout is dated March 27, 2003 (Opp'n ¶ 2, Ex. B2-SM), plaintiff did not rely upon the representation in that statement that his account had been credited with the $3,470.00 when issuing check #1595.

29

February 14, 2003 was a Friday, and because the following Monday, February 17, was Presidents Day, a bank holiday, the $3,470.00 check did not clear until three business days following HSBC's receipt of the check, at the soonest February 20, after check #1595 had been submitted to HSBC for settlement. (Reply at 4; Ryan Decl. Ex. B at OWUSU0093). Therefore, when check #1595 was presented, plaintiff had only $584.73 in his account (but see Ryan Reply Decl. ¶ 7 (referring to $704.70)), which was insufficient to cover the check, even if $500 in overdraft protection had been available.

Plaintiff also waived any claims against HSBC based on representations made by the bank in writing about account balance information. When he opened his checking account and agreed to the Rules for Deposit Accounts, he agreed to a term that "waive[d] any claim against [HSBC] based on representations made by the [HSBC], either orally or in writing, to [him], or [his] authorized person, regarding balance information." (Ryan Decl. Ex. B at OWUSU0098). Finally, neither the statement presented by plaintiff nor the one offered by defendant indicates that HSBC imposed any service charge for insufficient funds, which it did on other occasions when plaintiff overdrew his account. (See, e.g., Ryan Decl. Ex. F at 108; Opp'n Ex. C2-SM). Accordingly, there is no evidence that plaintiff suffered any injury as a result of this incident.

30

3. Failure to Credit Payments Made to Plaintiff's Credit-Card Account

Plaintiff alleges in his complaint that HSBC failed to credit several payments that he made to his credit-card account during the period when the account was open. (Compl. ¶ 9). He submits absolutely no evidence of such payments, however, and does not even identify the dates on which those payments were supposedly made. He necessarily fails to create a triable issue concerning this claim.

C. The Alleged Conspiracy Between HSBC and NYSID

As a separate matter, plaintiff alleges in his complaint that HSBC had a duty to notify him that his employer had stopped directly depositing his paycheck when his employment was suspended without pay and that it failed to do so. (Compl. ¶ 4-5). He also alleges, in entirely cryptic and conclusory terms, that HSBC improperly communicated personal information about plaintiff to a third party and that HSBC returned a check that plaintiff had issued to this third party in anticipation that his paychecks would no longer be deposited in the future, even though there were sufficient funds to cover the check in his account at the time. (Compl. ¶ 8).

In regard to the first claim, we conclude that HSBC had no

31

duty to tell plaintiff that his employer's direct deposits would come to an end. The relationship between a depositor and a bank is that of a debtor and creditor, and therefore no fiduciary relationship exists between them. Michie Ch. 15 § 178 at 394. Instead, banks are obligated by New York State law to act in good faith and "exercise ordinary care" in handling matters governed by agreements with customers. N.Y. U.C.C. Law §§ 1-201(3), 4-103(1); Call v. Ellenville Nat'l Bank, 5 A.D.3d 521, 523, 774 N.Y.S.2d 76 (2d Dep't 2004).


"Ordinary care" is defined as the degree of care necessary given the "realities of modern banking" and is determined by "sound banking practice." U.S. Fidelity and Guar. Co. v. Federal Reserve Bank of New York, 590 F. Supp. 486, 499 (S.D.N.Y. 1984). The UCC defines "good faith" as "honesty in fact in the conduct or transaction concerned." N.Y. U.C.C. Law § 1-201(19). To recover against a bank for "commercial bad faith" a plaintiff must show that the bank acted dishonestly. N.Y. U.C.C. Law § 1-201(19); Prudential-Bache Sec., Inc. v. Citibank, N.A., 73 N.Y.2d 263, 275, 539 N.Y.S.2d 699 (1989). An allegation of dishonesty without any competent evidence is insufficient to defeat summary judgment. Yanoscik v. North Fork Bank, 9 Misc.3d 1111(A), 806 N.Y.S.2d 405 (Table) (N.Y. Sup. Ct. 2005).

32

Plaintiff does not allege that HSBC misrepresented the status of his direct deposits. He simply asserts that it did not affirmatively notify him that NYSID had ended the arrangement -- which it had absolutely no obligation to do. Moreover, plaintiff submitted, as Exhibit 1 to his Fourth Amended Complaint, a November 29, 2004 memorandum sent to him by Mr. Peter Kreuter, his supervisor at NYSID (see Ryan Decl. Ex. B at B009) in which NYSID notified him that the direct deposit of his paycheck was suspended as of that date. (Compl. Ex 1). Plaintiff signed and dated the memorandum that same day, and thereafter no paychecks were deposited into his account. (Ryan Decl. Ex. F at 164). In short, plaintiff received advance notice from his employer that the direct deposit of his paychecks would end, and hence any failure by HSBC to notify him caused him no harm.[22]

As for plaintiff's vague allegation about disclosure of personal information and the related dishonor of a check, he does not name the party to whom HSBC allegedly communicated personal information, nor identify the particular check that was returned based on a forewarning that his direct deposit privileges would be terminated. This omission, and his failure to offer any competent

_____

[22] Similarly, HSBC cannot be held liable based on its alleged failure to send plaintiff checking account statements that might have shown the termination of his direct deposits, because he had independent notice.

33

evidence in support of these allegations, precludes any recovery.

## D.   HSBC's Closing of Plaintiff's Accounts

Plaintiff claims that HSBC acted improperly when closing his checking account by not responding to his inquiries made in response to defendant's December 14, 2004 letter notifying him of the closure. (Opp'n Ex. D2-SM). HSBC was under no obligation to answer such inquiries. According to the Rules for Deposit Accounts, HSBC reserved the right to close a deposit account "at any time by sending you a notice and or check for the balance." (Ryan Decl. Ex. B at OWUSU0099-100).

Plaintiff makes no specific allegations of impropriety connected with HSBC's closures of his credit-card account, but does allege that HSBC's report of plaintiff's debt to two third-party companies was improper. We discuss these allegations below.

### 1.   ChexSystems

Plaintiff alleges that it was improper of HSBC to report to ChexSystems that it had closed his account due to overdrafts. (Compl. ¶ 10; Opp'n ¶ 14). Defendant describes ChexSystems as "a third-party service, which provides access to a deposit account

34

computer database to member financial institutions seeking to determine whether to open deposit accounts for new customers." (Ryan Dec. ¶ 28). Plaintiff alleges that this action by HSBC violated the FCRA, FDCPA, FCBA, and federal and state banking laws. (Opp'n ¶ 14).

Plaintiff's claim brought under the FCRA must fail. The statute permits an individual to assert claims in defined circumstances, but only against entities that are not "consumer reporting agencies". 15 U.S.C. §§ 1681a(d), (f). HSBC is not such an entity by virtue of its reporting of customer information to ChexSystems. As noted in Smith v. First Nat'l Bank of Atlanta, 837 F.2d 1575, 1578 (11th Cir. 1988),

> where [a bank] has reported information based solely on its own experience with one of its customers [to a credit reporting agency], the bank is not acting as a "consumer reporting agency," within the meaning of the [FCRA] because, *inter alia*, it has not furnished a "consumer report" as that term is defined in the Act. A "consumer report" does not include "any report containing information solely as to transactions ... between the customer and the person making the report.

Id. (quoting 15 U.S.C. 1681a (d), (f)); see also Daniels v. National City Bank, 947 F.2d 944 (Table), 1991 WL 230835, at *1 (6th Cir. Nov. 8, 1991). Moreover, to sustain a claim predicated on a willful or negligent violation of FCRA, 15 U.S.C. § 1681e(b), the plaintiff must demonstrate that the credit information provided by

35

the defendant was inaccurate. See, e.g., Fashakin v. Nextel
Commc'ns, 2009 WL 790350, at *11 (E.D.N.Y Mar. 25, 2009); Houston
v. TRW Info. Servs., Inc., 707 F. Supp. 689, 691-92 (S.D.N.Y.
1989). Plaintiff fails to offer any evidence of falsity in HSBC's
report.

Similarly, plaintiff cannot sustain a claim against HSBC under
the FDCPA, which "expressly limits its application to debt
collectors, not creditors." Doherty v. Citibank (South Dakota),
N.A., 375 F. Supp.2d 158, 162 (E.D.N.Y. 2003); see also 15 U.S.C.
§ 1692(e) (identifying the purpose of the FDCPA to be "to eliminate
abusive debt collection practices by debt collectors.") A debt
collector is defined as

  any person who uses any instrumentality of interstate
  commerce or the mails in any business the principal
  purpose of which is the collection of any debts, or who
  regularly collects or attempts to collect, directly or
  indirectly, debts owed or due or asserted to be owed or
  due another.

15 U.S.C. § 1692a(6). HSBC does not fit this definition -- indeed,
plaintiff makes no effort to demonstrate that it does -- and in any
event, a creditor may only be liable for actions undertaken in
seeking to collect its own debt if it "'uses any name other than
its own which would indicate that a third person is collecting ...
such debts.'" Maquire v. Citicorp Retail Servs., Inc., 147 F.3d
232, 235 (2d Cir. 1998) (quoting 15 U.S.C. § 1692a(6)). Since

36

HSBC's letter was sent in its own name (see Ryan Decl. Ex. B at B0012; Opp'n Ex. D2-SM), it cannot be held liable under the FDCPA.

Finally, HSBC cannot be liable under the FCBA for reporting plaintiff to ChexSystems, as HSBC reported the closure of his checking account and ChexSystems is a company concerned only with abuse of deposit accounts. The FCBA governs only the billing practices of creditors with regard to credit-card accounts. See 15 U.S.C. § 1666(a). Moreover, HSBC's actions did not amount to "billing errors" as defined by the FCBA. See 15 U.S.C. § 1666 (b).[23]

## 2. Laridian

Plaintiff alleges that HSBC sold the debt related to his accounts to another entity, named Laridian, which plaintiff describes as a "bounty hunter"; that it did so without first following proper procedures to collect on the debt; and that the bank then later attempted to collect on the same debt that it had

---

[23] Billing errors include incorrect reflections on a statement that credit was extended when it was not or when an obligor asked for clarification of the credit extension, that goods or services were accepted by or delivered to the obligor, that a payment was not made by an obligor, computational errors, and failures to transmit statements to the obligor's last known address. 15 U.S.C. § 1666 (b).

37

sold.[24] (Compl. ¶ 6; Opp'n ¶ 13). In support of these contentions,
plaintiff provides to the court an "Order for Arrest" filed by
Laridian in the Superior Court of New Jersey on November 9, 2004,
alleging that Owusu had failed to respond to an information
subpoena. (Opp'n ¶ 13, Ex. D1-SM). Plaintiff claims that Laridian
had taken plaintiff to court, seeking $1,500, "a debt amount
plaintiff had no knowledge of". (Compl. ¶ 6).

While plaintiff claims that Laridian was attempting to collect
on a debt that he owed to HSBC related to the accounts at issue in
this lawsuit, he offers no evidence that this is the case. Indeed,
this silence is consistent with his allegation that he "had no
knowledge" of the debt that Laridian was seeking to collect. Quite
to the contrary, it appears that Laridian was seeking to collect a
debt owed by plaintiff to another corporate entity in connection
with a separate credit card. The proposed order that plaintiff
proffers as evidence was filed on November 9, 2004, well before any
of plaintiff's accounts were closed by defendant. (Opp'n Ex. D1-

---

[24] It appears that HSBC did engage two debt collection
agencies, NCO Financial Systems, Inc. ("NCO") and Plaza
Associates ("Plaza"), to collect what appears to be plaintiff's
debt related to his checking account. (Ryan Decl. Ex. B at B004,
B007). NCO sent plaintiff a letter seeking to collect $157.04,
naming HSBC Bank USA, National Association as the creditor, on
May 6, 2005. Plaza sent plaintiff a letter that also sought to
collect the $157.04 on January 27, 2006. It is unclear if
plaintiff ever paid this debt, but he makes no allegations
related to these collectors and there is no appearance of
impropriety.

SM). On its face, the order identifies Laridian as the assignee of Household Bank. (Id.). Plaintiff acknowledges that he had several credit cards, including a Household Bank credit card. (Opp'n ¶ 8). The Household Bank credit card is a branded credit card issued by HSBC Bank Nevada, N.A.[25] HSBC Bank Nevada, N.A., a federally chartered credit card bank, and HSBC Bank USA, N.A., which oversees many of HSBC's American banking operations, are subsidiaries of HBSC Holdings, PLC, through its wholly owned subsidiary, HSBC North America Holdings, Inc.[26]

Plaintiff presents no evidence relating to the sale of the Household Bank debt to Laridian (other than the "Order for Arrest"), and makes no showing that would connect defendant HSBC Bank USA to this debt. Since Laridian, Household Bank, and HSBC Bank Nevada, N.A. are not parties to this lawsuit and since plaintiff offers no evidence relating to the Household Bank credit card, there is no apparent basis to litigate here the propriety of any assignment of this debt. See, e.g., United States v. Bestfoods, 524 U.S. 51, 60 (1998) (without evidence that parent corporations and their subsidiaries did not maintain separate corporate

---

[25] See Household Bank Credit Card Privacy & Security, http://www.householdbank.com/ecare/privacy_nli#web_Terms (last visited May 7, 2009).

[26] See HSBC Finance Corp., Annual Report (Form 10-k), at 4, 12 (Mar. 2, 2009), http://www.sec.gov/Archives/edgar/data/354964/000095012309003738/c49377e10vk.htm (last visited June 4, 2009).

39

identities, a parent corporation and its subsidiaries cannot be held liable for the others' actions); Metito (Overseas) Ltd. v. Gen. Elec. Co., 2009 WL 399221, at *15 (S.D.N.Y. Feb. 18, 2009) (holding that a parent company cannot be held liable for actions of subsidiaries that are not named defendants in the lawsuit); In re Lernout & Hauspie Sec. Lit., 230 F. Supp.2d 152, 170 (D. Mass. 2002).

### E.   Damages

Plaintiff claims damages related to (1) the loss of a business opportunity that he alleges he would have been able to pursue but for his inability to obtain a bank account and (2) reputational injury caused by his inability to obtain a bank account. Plaintiff alleges that the loss of the business opportunity was caused by the closure of an account at a bank that is not a party to this lawsuit, but that the closure followed HSBC's report to ChexSystems. (Compl. ¶ 10). Wholly apart from plaintiff's failure to plead or prove a viable legal claim against HSBC on the basis of which to recover damages, these alleged consequential damages cannot be collected by plaintiff.

Under New York contract law, which is consistent with contract law in the United States generally, recovery is limited to "'those

40

injuries which the parties could reasonably have anticipated at the time the contract was entered into.'" Tevdorachvili, 103 F. Supp.2d at 641 (quoting Spang Indus., 512 F.2d at 368 (citing Hadley v. Baxendale, 156 Eng. Rep. 145 (Ex. 1854)). In Tevdorachvili, plaintiff was not allowed to collect damages for lost business opportunities caused, allegedly, by defendant's improper management of an account. Id. Quoting the New York State of Appeals, the court in Tevdorachvili observed that under New York state law

> it must be demonstrated with certainty that such damages have been caused by the breach and [that] the alleged loss must be capable of proof with reasonable certainty. In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes.... In addition, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made....

Id. (citing Kenford Co. v. County of Erie, 67 N.Y.S.2d 257, 261, 502 N.Y.S.2d 131 (1986)).

Plaintiff has not pled facts that might, if proven, establish that HSBC's actions were the proximate cause of his harmed reputation or lost business opportunity, much less that HSBC knew that such a loss was a risk. In any event, HSBC cannot be held liable for harm caused to plaintiff by actions of potential business partners or by another bank.

41

## F. Plaintiff's Request to Reopen Discovery

Finally, plaintiff seeks to reopen discovery, apparently as a means of avoiding summary judgment. This request is without merit.

A request for additional discovery in the context of a summary judgment motion is governed by Rule 56(f) of the Federal Rules of Civil Procedure. A court may deny a motion for summary judgment or, in the alternative, grant a continuance to complete discovery if the party opposing the summary-judgment motion "contends that additional discovery is required." Martinson v. Menifee, 2007 WL 2106516, at * 6 (S.D.N.Y. July 18, 2007). The Second Circuit has held that such a request must appear in an affidavit and that this affidavit must include (1) "the nature of the uncompleted discovery;" (2) "how the facts sought are reasonably expected to create a genuine issue of material fact;" (3) "what efforts the affiant has made to obtain those facts;" and (4) "why those efforts were unsuccessful." Paddington Partners v. Bouchard, 34 F.3d 1132, 1137-39 (2d Cir. 1994). However, "neither bare allegations nor mere speculation will suffice to stay a motion for summary judgment. Plaintiff must furnish enough information to convince the court that it is not engaged in a fishing expedition for claims that have no hope of being substantiated." Four Star Capital Corp. v. Nynex Corp., 183 F.R.D. 91, 99 (S.D.N.Y. 1997).

While Owusu did not file an affidavit requesting extended discovery, as required by Rule 56(f), we may give latitude to a pro se litigant, even though "[a] party's failure to submit an affidavit is a proper ground for denial of the request" and "[r]equests made in filings other than an affidavit also constitute a proper basis for denial." Am. Home Assurance Co. v. Zim Jamaica, 418 F. Supp.2d 537, 546 (S.D.N.Y 2006); see, e.g., Martinson, 2007 WL 2106516, at *6 (finding that a "Memorandum of Law" filed by a pro se plaintiff was sufficient under Paddington Partners because it explicitly referenced Rule 56(f) and included within the memorandum an allegation that defendants "transformed" their motion into a summary judgment motion "as if discovery had been conducted", leaving plaintiff at a disadvantage when responding because he had had no discovery).

Plaintiff explicitly requests in his opposition that the court extend discovery pursuant Rule 56(f). He asserts "that without further discovery, Plaintiff cannot swore [sic] an affidavit, at this stage, to establish the material facts essential to justify his opposition to the Defendant's motion for summary judgment." (Opp'n 5). He requests, pursuant to Rule 56(f), that the court order a continuance of discovery so that he may obtain affidavits and depositions. (Id.). We therefore find that plaintiff's request for further discovery takes the functional form of an affidavit.

43

Plaintiff's request however, must also meet the four substantive requirements imposed by the Second Circuit in Paddington Partners, 34 F.3d at 1137-39.

As to the first requirement, throughout his opposition plaintiff states that documents relating to HSBC's report to ChexSystems have not been provided (see Opp'n ¶ 14), that documents relating to his account applications have been provided but, allegedly, have been "tampered with" (see Opp'n ¶ 7), and identifies one individual, Mr. Eric Grossman,[27] whose deposition he would like to take in order to discover information relating to the allegedly forged application for a credit-card account. (See Opp'n ¶ 8).

We find that plaintiff fails to meet the first requirement of Paddington Partners with regard to his requests for documents that he hopes will show that HSBC acted improperly when reporting to ChexSystems and that his account applications have been forged. These requests are reiterations of requests he had previously made to the court after discovery had closed. (See letters from Kwame Owusu to the Court dated Dec. 26, 2007; Jan. 23, 2008; Feb. 29,

---

[27] Mr. Grossman's name appears on plaintiff's credit-card account application, and seemingly was the HSBC employee who assisted him in opening the account. (See Ryan Decl. Ex. C; Opp'n ¶ 8).

44

2008; Mar. 5, 2008). In response to these previous requests, the court determined that defendant had fulfilled its discovery obligations with respect to these types of documents. (See Orders dated Jan. 7, 2008; Feb. 14, 2008; Feb. 21, 2008; Mar. 10, 2008; and Mar. 14, 2008).

At this point, plaintiff provides no new arguments as to why these documents are necessary for him to establish a genuine issue of material fact. He does not identify any particular documents that he has not yet received -- instead he simply asserts that there must be more documents in existence -- nor does he explain why such documents are likely to support his allegations. There has already been significant discovery related to both HSBC's report to ChexSystems and his credit-card account application, and plaintiff fails to offer any specific reason why continued discovery will be likely to allow him to establish a genuine issue of material fact. Plaintiff's "'mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of [a summary judgment] motion.'" Gray v. Town of Darien, 927 F.2d 69, 74 (2d Cir. 1991) (quoting Contemporary Mission, Inc. v. U.S. Postal Serv., 648 F.2d 97, 107 (2d Cir. 1981)). The continuation of discovery would result in a fishing expedition that we cannot allow. See, e.g., First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 270 (1968).

45

As for plaintiff's request to depose Mr. Grossman, apparently in an effort to uncover information relating to the alleged forgery of his credit-card account application, this too does not justify Rule 56(f) relief. This is the first time that plaintiff has requested to depose Mr. Grossman, despite the fact that he learned of Mr. Grossman's name and involvement before discovery closed, when HSBC turned over a copy of his credit-card account application. (See letter from Kwame Owusu to the Court dated Jan. 23, 2008 at 2; Ryan Decl. Ex. C). Paddington Partners requires that an opponent of a summary judgment motion explain "what efforts [he] has made to obtain ... facts" and "why those efforts were unsuccessful" in order to ensure that parties are not rewarded for dragging their feet during discovery. See Paddington Partners, 34 F.3d at 1137-39. Plaintiff provides no explanation why he did not request Mr. Grossman's deposition during discovery or seek to extend discovery in order to take the deposition. A court should not deny summary judgment in such circumstances, for "[a] party who both fails to use the time available and takes no steps to seek more time until after a summary judgment motion has been filed need not be allowed more time for discovery absent a strong showing of need." Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 928 (2d Cir. 1985).

In any event, plaintiff fails to demonstrate that any

46

testimony that Mr. Grossman might offer would avert summary judgment. As we have noted, the purported forgery of account applications is unsupported by any documentation, and in any event it is clear beyond dispute that plaintiff was long on notice as to the nature of the accounts that HSBC had opened for him. In sum, a deposition of Mr. Grossman would be an exercise in futility.

## CONCLUSION

For the reasons stated above, we recommend that defendant's motion for summary judgment be granted.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Deborah A. Batts, Room 2510, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989);

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


**DATED: New York, New York**
**June 12, 2009**


                              **RESPECTFULLY SUBMITTED,**


                              **MICHAEL H. DOLINGER**
                              **UNITED STATES MAGISTRATE JUDGE**

48

Copies of the foregoing Report and Recommendation have been mailed this day to:

Mr. Kwame Owusu
639-B Bruce Street
Ridgefield, NJ 07657

Michael T. Ryan, Esq.
HSBC Bank USA, N.A.
2700 HSBC Center
Buffalo, NY 14203